IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

FEB 2 3 2010

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| HAZEL P. MCLEOD and LARRY MCLEOD, | § § § | |
| Plaintiffs, | § | No. SA-06-cv-17-RF |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties appeared before the Court for a bench trial in this case on September 14-15, 2009; September 21-22, 2009; and November 10, 2009. Having heard and considered all of the admissible evidence in this case and reviewed the law applicable to the matter, the Court enters this memorandum order setting forth its findings of fact and conclusions of law.

Plaintiffs Hazel and Larry McLeod filed this case, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671. They complained of injuries sustained during and resulting from medical care provided to Hazel McLeod by the Wilford Hall Medical Center ("Wilford Hall") about January 2003. Plaintiffs alleged that the United States, through the United States Air Force, who owned, operated, and provided medical care at Wilford Hall, negligently supervised or performed a surgical breast biopsy on Mrs. McLeod's right breast causing her injury and damages. The United States did not dispute Mrs. McLeod's injuries but challenged liability and the extent of damages.

1

## I. Factual and Procedural Background

Plaintiffs complained that Wilford Hall physicians (including a staff physician and a surgery resident) were negligent in performing a surgical biopsy on Mrs. McLeod on January 17, 2003.[1] Plaintiffs alleged negligence, including lack of informed consent (by failing to inform her that the surgery would be performed by a surgical resident), the manner in which the biopsy was performed, and the post-operative treatment. Plaintiffs alleged that as a proximate result of this negligence, Mrs. McLeod suffered serious, permanent and disabling nerve and tissue injuries and resulting muscle injuries, in the form of Complex Regional Pain Syndrome with secondary capsulitis in the right shoulder.[2]

---

[1] Plaintiffs filed their First Amended Complaint ("FAC") on July 29, 2009. *See* Docket no. 90.

[2] Although not admitted at the trial or used here as a legal standard, the Social Security Rulings provide a useful description of Complex Regional Pain Syndrome ("CRPS") or Reflex Sympathetic Dystrophy Syndrome ("RSDS").

> RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger RSDS/CRPS. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. When left untreated, the signs and symptoms of the of the disorder may worsen over time.

> Although the pathogenesis of this disorder (the precipitating mechanism(s) of the signs and symptoms characteristic of RSDS/CRPS has not been defined, dysfunction of the sympathetic nervous system has been strongly implicated.

Social Security Ruling 03-02p, Titles II and XVI: Evaluating Cases Involving Reflex Sympathy

Plaintiffs alleged that Mrs. McLeod is permanently disabled as a result of those injuries. Mr. McLeod alleges loss of consortium damages. Defendant denied negligence and argued that nerve injury is a known complication of the breast biopsy performed. Defendant argued that Mrs. McLeod was informed of this potential complication and consented to the procedure. Before the bench trial, Defendant also moved for partial summary judgment on the issue of whether it had a duty to disclose that a resident would perform the surgery in order to satisfy informed consent.

On January 17, 2003, Dr. Broadus Atkins, a supervising staff surgeon, and Dr. James Connaughton, a resident physician, performed a needle localization biopsy on Mrs. McLeod at Wilford Hall. Dr. Connaughton made the incisions under Dr. Atkins's supervision, and at some point, Dr. Atkins took over the procedure and completed removal of the mass.

## II. Legal Standard

The FTCA provides that the United States is liable for tort claims, with specific exceptions, "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The liability of the United States is determined in an FTCA case by reference to state law. 28 U.S.C. §§ 1346(b), 2674; *Molzof v. United States*, 502 U.S. 301, 305 (1992). In this case, the tort claim for medical malpractice is controlled by Texas state law. *See Hollis v. United States*, 323 F.3d 330, 334 (5th Cir. 2003).

---

Dystrophy Syndrome/Complex Regional Pain Syndrome, 2003 SSR LEXIS 2 at *4-5, 2003 WL 22399117, at *1 (2003); *see also Robinson v. Comm'r of Soc. Sec.*, 146 Soc. Sec. Rep. Serv. 353, n.1 (S.D. Ohio) (Feb. 7, 2008).

To recover under Texas law on a medical malpractice claim,

> a plaintiff must establish the following elements: (1) a legally cognizable duty requiring the physician to conform to a certain standard of care or conduct, (2) the applicable standard of care, (3) a breach of that standard, (4) injury, and (5) a reasonably close causal connection between the breach and the injury the plaintiff suffered.

*Wax v. Johnson*, 42 S.W.3d 168, 171 (Tex. App.— Houston [1st Dist.] 2001, *pet. denied*);

*see also Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008).

"The standard of care is a threshold issue which the plaintiff must establish before the fact finder moves on to consider whether the defendant breached that standard of care to such a degree that it constituted negligence." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (citing *Mills v. Angel*, 995 S.W.2d 262, 268 (Tex. App.—Texarkana 1999, no pet.); *Denton Reg. Med. Ctr.*, 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997, no pet.)). In this case, the parties do not dispute that the physicians had a legally cognizable duty to Mrs. McLeod requiring that they conform to the standard of care for physicians and surgeons. Nor do the parties dispute that Mrs. McLeod was injured. The parties dispute whether the doctors breached the standard of care and causation.

### III. Analysis

Plaintiffs characterize their Complaint and the evidence at trial as setting forth three claims arising under the FTCA: (1) negligence in performance of the operation on the basis of failing to obtain Mrs. McLeod's informed consent; (2) negligent supervision by Dr. Atkins of Dr. Connaughton; and (3) breach of the standard of care in the performance of the surgical

4

biopsy, the completion of a detailed and comprehensive and dictated operative report for the surgery, and in failing to timely recognize, diagnose, and treat Mrs. McLeod's injuries. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Docket no. 140), at ¶ 25 (stating five claims, instead of the three above, by separating out each instance of breach of the standard of care as a separate claim of negligence). The Court addresses each separately.

## A.    Informed Consent

First, Plaintiffs allege deficiencies in the informed consent that Mrs. McLeod signed prior to the surgical procedure. Plaintiffs alleged that Mrs. McLeod was not aware that Wilford Hall is a teaching hospital and was not informed that the surgery would be performed, in part, by a surgery resident. At trial, Mrs. McLeod testified that she would not have consented to having a resident perform the surgery. The Court finds Mrs. McLeod's testimony credible.

It is undisputed that Mrs. McLeod signed an informed consent form on or about January 6, 2003, that authorized "'Dr. Atkins and Associates' as my physician and such associates, technical assistants and other health care providers as necessary, to treat my condition which has been explained to me as: right breast mass." Gov't Ex. 9, at ¶ 1 (the form reflects that both "Dr. Atkins and Associates" and "right breast mass" were filled-in by hand). The consent form referenced the needle localization biopsy of the right breast, as was ultimately performed. *See id.* at ¶ 2. Most importantly, the informed consent signed by Mrs. McLeod also states,

13. I have been given an opportunity to ask questions about my condition, alternative forms of anesthesia and treatment, risks of nontreatment, the procedures to use, and the risks and hazards involved, and I have sufficient information to give this informed consent.

14. I certify this form has been fully explained to me, the blank spaces here have been filled in, and I have either read it or have had it read to me, and I understand the contents.

*Id.* at ¶¶ 13-14.

Based upon her allegations and testimony, Plaintiffs argue that Defendant was negligent in failing to obtain her informed consent prior to the surgery. *See, e.g.,* Docket no. 140, at ¶¶ 15, 25. The Court disagrees despite crediting Mrs. McLeod's testimony. Mrs. McLeod now swears, credibly, that she would not have consented to the surgery had she known that a resident would perform the biopsy, but her consent form indicates that despite that truth at this time, Mrs. McLeod had the information at the time of giving her consent that she wanted to have. *See id.* The Court cannot conclude on this record that Defendant was negligent in obtaining Mrs. McLeod's informed consent. Defendant informed Mrs. McLeod that "Dr. Atkins and Associates" would perform the surgery, along with other "associates, technical assistants, and other health care providers as necessary." Plaintiffs have not demonstrated by a preponderance of the evidence that the resident Dr. Connaughton's performance of part of the surgical biopsy violates the terms of Mrs. McLeod's informed consent to the extent that there was no informed consent at all. Nor have Plaintiffs demonstrated that negligence occurred in Dr. Atkins failure to specify that a resident would perform part of the procedure where the consent form includes the information that

associates may participate.

Rather, a preponderance of the evidence demonstrates that Mrs. McLeod was adequately informed of the potential risks and hazards of the procedure, the alternatives to the procedure, the scope of professionals who might participate in her care during the procedure, and demonstrates that Mrs. McLeod voluntarily gave consent to proceed after an opportunity to ask any questions she had at the time. On this claim of negligence, the Court grants judgment in favor of Defendant.

Contrary to Defendant's arguments, the Court does not conclude that Plaintiffs stated a claim for battery. *See* Defendant's First Am. Proposed Findings of Fact and Conclusions of Law (Docket no. 144), at ¶¶ 33-25; Plaintiffs' Response to Defendant's First Am. Proposed Findings of Fact and Conclusions of Law (Docket no. 145), at 1-2 (clarifying that Plaintiffs never made allegations of assault or battery).

## B.    Negligent Supervision

Next, Plaintiffs alleged that Dr. Atkins failed to properly supervise Dr. James Connaughton during the surgical biopsy. Plaintiffs failed to demonstrate negligent supervision by a preponderance of the evidence. There was simply no demonstration of how Dr. Connaughton's <u>supervision</u> impacted the procedure one way or another, as opposed to how the doctors' joint <u>performance</u> impacted the procedure.

## C.    Breach of Standard of Care

The Court considers next whether Plaintiffs proved by a preponderance of the

evidence that Drs. Atkins and Connaughton breached the standard of care – in other words, whether they were negligent in their diagnosis, treatment, surgical biopsy, or follow-up care of Mrs. McLeod. At the outset, the Court finds that Mrs. McLeod suffers from Complex Regional Pain Syndrome ("CRPS") with secondary adhesive capsulitis of the right shoulder. Multiple treating physicians at Wilford Hall, as well as Defendant's experts, Dr. Harold Urschel and Dr. William Gillanders, agree on this diagnosis. Defendant's expert, Dr. Charles Crane, raised questions about this diagnosis. The Court concludes that the preponderance of the evidence demonstrates that Mrs. McLeod suffers from CRPS with secondary adhesive capsulitis of the right shoulder. Plaintiffs argue that Mrs. McLeod's current diagnosis is factually and proximately caused by the negligence of Defendant. Defendant argues that no negligence occurred and that Plaintiffs cannot demonstrate causation.

### 1.    Negligence

"In a suit for medical malpractice, expert testimony is required to prove negligence . . . . In particular, expert testimony is necessary on the issue of medical negligence and causation." *Linan v. Rosales*, 155 S.W.3d 298, 302 (Tex. Ct. App. 2004) (citations omitted).

### a. Surgical procedure

Plaintiffs offered expert testimony on the standard of care from Harold Bruck, MD; Alex Willingham, MD; and Thomas Mayor, PhD. Dr. Bruck testified that he has been a board certified surgeon since 1969, and his specialty is in the diagnosis and surgical treatment of breast diseases. Dr. Bruck is licensed in Texas, New Jersey, and New York.

He currently practices full time, and approximately ninety percent of his patients have breast disease issues. Annually, he performs over three hundred breast surgeries, including between 125-150 breast cancer cases. Dr. Bruck has academic and military experience.

Dr. Bruck opined that if "anything suspicious [appears] in the breast by exam or by breast imaging, a biopsy is indicated." However, the surgeon should use the least invasive procedure possible. In Mrs. McLeod's case, it is undisputed that physicians used a needle wire localization biopsy. Dr. Bruck described this pre-surgical procedure in his direct testimony:

> Guided by either mammography or an ultrasound, a radiologist uses a very thin needle or guide wire to mark the location of the abnormal area of tissue inside the breast, so the mass can later be surgically removed by the surgeon. The radiologist places the wire in or around the abnormal area of concern in the breast. The wire has a hook at the end (like a fish hook) that secures the wire to remain in place in the breast at the site of the mass for the surgeon to then locate the mass and remove it during the biopsy. After the radiologist places the wire, he tapes the end of the wire to the outside of the breast so the wire does not become dislocated. The surgeon can then use the placed wire as a guide in finding the tissue to be removed during the biopsy.

The patient is then taken to the operating room, and the surgeon must determine the site of entry into the breast that is closest to the mass, causing the least amount of risk to nerves and tissues of the breast. "The surgeon's responsibility is to identify where the mass is located by evaluating the localization images and gently tugging on the wire," enabling the surgeon to feel the wire tip and therefore locate the incision on the outside of the breast. *Id.*

Dr. Bruck emphasized the importance of the surgeon's choice of location of surgical incision. Complications are more likely when the incorrect site is used. Typically, the least

9

risk presents at the site of entry on the outside of the breast that is closest to the mass inside the breast. "Choosing the correct site for the incision is crucial to avoid injury to the breast and adjacent nerves and to achieve minimal scarring." *Id.* The effects of improperly or negligently choosing the incision site may result in excessive tunneling (cutting deeply into the breast) to get the mass. This, in turn, increases the likelihood of trauma to breast tissue and to nerves. When a mass is difficult to locate or to remove, a surgeon must avoid multiple attempts to search in the breast with the scalpel because excessive dissection increases bleeding and requires more cautery, which is also a contributing factor to complications.

Dr. William E. Gillanders, an expert witness for the United States, testified that at least two possible surgical approaches existed in the performance of a wire-guided surgical breast biopsy, as was performed on Mrs. McLeod. The Court was not persuaded by Dr. Gillanders's testimony on this issue. Dr. Gillanders agreed with Dr. Bruck that the text, Bland, K.I. & Copeland, E.M., *The Breast: Comprehensive Management of Benign and Malignant Disorders, Vol. I* (Saunders, 3d ed. 2004), is authoritative. Blond & Copeland states: "The incision should be placed directly over the mammographic abnormality, regardless of where the entry site of the wire is positioned." *Id.* at 791. Dr. Gillanders agreed that the preferred method is to enter over the mammographic abnormality. Dr. Gillanders testified that an alternative approach exists, as offered by Blond & Copeland, but he agreed that the preferred method of entry is over the mammographic abnormality. When the Court offered Dr. Gillanders an opportunity to harmonize why the preferred method was

10

not used by Dr. Atkins and Dr. Connaughton in Mrs. McLeod's case, Dr. Gillanders could not harmonize the contradicting methods of surgical entry and merely agreed with Dr. Bruck about the preferred method of entry. Indeed, testimony revealed various hypothetical variances that might comport with the standard of care, no expert in this case concluded that any such variance existed in Mrs. McLeod's case. And no expert in this case explained why any deviation from the preferred performance of a surgical breast biopsy was required or merited in Mrs. McLeod's case. The size and location of the incision, the amount of breast tissue removed in comparison with the size of the abnormality, were medically unnecessary and ultra vires the standard of care.[3]

In violation of the standard of care required of surgeons performing breast biopsy surgery, the incision for Mrs. McLeod's biopsy was placed away from the nodule to be removed, as identified by the localization wire, instead of directly over it or at the nearest possible site relative to the anatomy of Mrs. McLeod. This deviation from the standard of care resulted in excessive dissection, tissue removal, cauterization, and pressure from prolonged tissue retraction.

//

---

[3] The Court cautions that this finding and conclusion should not be restated as a conclusion that any breast biopsy surgery in which the surgeon does not follow the recommended entry position and procedure as explained by Bland and Copeland equates a deviation from the standard of care. Such a restatement would be an inaccurate extension of the Court's findings and conclusions in this case. Any number of anatomical or medical reasons may exist for such a deviation. None, however, was demonstrated as applying to the case of Mrs. McLeod. And no credible, compelling, and medically appropriate explanation was demonstrated for the size of the incision or the amount of breast tissue removed in comparison with the size of the abnormality.

11

### b. Postoperative treatment and follow-up

On January 27, 2003, during a follow-up visit, Mrs. McLeod reported her pain and numbness to Dr. Atkins. Mrs. McLeod reported that her pain level remained at a 7 or 8 out of 10, on a perception scale, even after treatment with the prescribed pain management of Vicodin. Defense expert, Dr. Gillanders testified that he would be concerned by such a report. However Dr. Atkins did not provide an explanation for the pain or provide any additional treatment. Mrs. McLeod saw Dr. Atkins again on April 10, 2003, and there described again her pain. Dr. Atkins referred Mrs. McLeod to occupational therapy but did not order diagnostic tests and discounted the relationship between Mrs. McLeod's pain and the surgery.

### c. Wilford Hall's records

Throughout this case, the United States struggled to provide the complete medical records of Mrs. McLeod, as maintained by Wilford Hall. Before trial, the United States could not timely and reliably produce Mrs. McLeod's medical records. During trial, the evidence clearly and unequivocally established that Wilford Hall's policy required a detailed and comprehensive dictated operative report be prepared for every surgery, including Mrs. McLeod's. Dr. Atkins testified that the written "operative note" in Mrs. McLeod's medical records was not the requisite dictated operative report. Both testimony and the arguments of counsel at trial revealed that Mrs. McLeod's medical records were not maintained sufficiently reliably between the date of the surgery, the dates of follow-up treatment, and

12

trial. Each of these examples causes concern. With respect to negligence, however, it is Dr. Atkins's and Dr. Connaughton's failures to adhere to Wilford Hall's policy regarding dictated operative reports that constitute a breach of their duty to Mrs. McLeod. Drs. Connaughton and Atkins deviated from the standard of care in not preparing a dictated operative report in conformance with governing policy. The remaining failures of the United States to maintain and safeguard complete and reliable medical records, although troubling, do not rise to the level of breach with respect to Mrs. McLeod's surgery, treatment and care.

### 2.    Causation

The Government's primary defense was a lack of proximate cause. It is undisputed that CRPS may be ideopathic. This fact alone cannot resolve the dispute before the Court. "[T]o establish a causal connection between her injury and the negligence" described above, Plaintiffs had to establish causation based on "reasonable medical probability, not mere conjecture, speculation or possibility." *Linan*, 155 S.W.3d at 305 (citations and internal quotation marks omitted).

The Court found credible and ultimately persuasive the testimony of Dr. Bruck that the surgeons' deviation from the standard of care in the performance of Mrs. McLeod's surgical breast biopsy resulted in the nerve damage that factually and legally caused Mrs. McLeod's CRPS and Plaintiffs' injuries. Dr. Bruck's credible testimony demonstrated by a preponderance of the evidence that the negligence in performing the surgical breast biopsy and in postoperative treatment was "a substantial factor in bringing about the harm

13

and without which the harm would not have occurred." *Id.* (quoting *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995).

Based upon the compelling testimony of Dr. Bruck and the testimony of Dr. Gillanders who could not reconcile for the Court why the admittedly preferred surgical procedure was not used in Mrs. McLeod's case, the Court concludes that in the absence of Dr. Atkins's and Dr. Connaughton's negligence, the injuries would not have occurred and that the negligence both at the selection of the surgical entry site as well as the amount of tissue resected (requiring excessive cauterization), substantially factored in the causation of Mrs. McLeod's CRPS-related injuries. Plaintiffs demonstrated beyond a preponderance of the evidence that negligence was a factual and legal cause of the injuries sustained.

As a direct and proximate result of the breast biopsy surgery, Mrs. McLeod suffered unnecessary nerve, tissue and muscle injuries, in turn causing her pain, numbness and impairment continuously since January 2003.

### 3.    Injuries

Mrs. McLeod is totally and permanently disabled as a result of her nerve, tissue and muscle injuries and resulting CRPS with secondary adhesive capsulitis of the right shoulder.

The Court finds that the life care plan of Dr. Alex Willingham is largely credible in its projection of future medical care, therapy, and related health care needs for Mrs. McLeod. However, the Court finds that Dr. Willingham's projection is in part excessive. The Court finds that the life care plans prepared by Defendant's experts Kathleen Kuntz, R.N., and Dr.

14

Charles Crane are inadequate to address Mrs. McLeod's current and future medical needs resulting from Defendant's negligence. Therefore, the Court reduces by a portion the Court finds reasonable Dr. Willingham's projection for future health care of Mrs. McLeod.

With respect to discount rate, however, the Court finds that the testimony of Stan Smith, Ph.D., Defendant's expert economist, is persuasive. Plaintiffs' expert economist, Thomas Mayor, Ph.D., used a constant real discount rate of 1.5% (net of inflation and taxes), which was based on a 5.58% 50-year average of safe investments, such as 6-month T-bills. On the other hand, Dr. Smith used a discount rate (beginning in year 6) of 5.44%, based on the alleged 9.3% 20-year average total rate of return (face interest rate plus capital gains) of long-term government bonds. Dr. Smith testified that the present value of Mrs. McLeod's loss of future earning capacity is $330,019.

In *Culver v. Slater Boat*, 722 F.2d 114, 118 (5th Cir. 1983), the Court included in the determination of the proper return available, "the best and safest investments." An oft-adopted example of a safe and best investment is the long term governmental bond. The Court finds that Dr. Smith's testimony about the methodology he used to arrive at his discount rate and present value comport with the *Culver* requirement. Moreover, the Court is persuaded by Dr. Smith's thorough articulation of the bases for his opinions. Accordingly, the discount rate of 5.44%, as calculated on long term government bonds, shall apply in the present value calculation in this case.

The Court concludes, based upon the testimony at trial, that the following sums if paid

15

now in cash would fairly and reasonably compensate Mrs. McLeod for her damages:[4]

1. Past physical pain and impairment: $250,000
2. Future physical pain and impairment: $150,000
3. Past mental anguish: $25,000
4. Future mental anguish: $25,000
5. Past lost earnings: $117,884
6. Future loss of earning capacity: $330,019
7. Future medical expenses: $575,000

The following sums, if paid now in cash, would fairly and reasonably compensate Mr. Larry McLeod for his damages:

1. Past loss of consortium: $20,000
2. Future loss of consortium: $20,000

In light of the damages cap applicable under Texas law, *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.301, the Court reduces the above non-economic damage awards as a matter of law, as follows: Mr. and Mrs. McLeod are awarded $250,000 in non-economic damages. Additionally, Mrs. McLeod is awarded $117,884 in past lost earnings; $330,019 in future lost earnings; and $575,000 in future medical expenses.

## IV. Conclusion

For the foregoing reasons, the Court enters judgment for Plaintiffs on the claims of negligence based on the performance of the surgical breast biopsy and follow-up care and treatment. The Court enters judgment for Defendant on Plaintiffs' claims of negligence

---

[4] In considering the evidence regarding damages and reviewing the award of damages here, the Court has carefully applied the Fifth Circuit's rule regarding the comparison of awards in factually similar cases decided under controlling law, here Texas law. *See In re Air Crash Disaster Near New Orleans*, 767 F.2d 1151, 1156 (5th Cir. 1985); *see also Marcel v. Placid Oil Co.*, 11 F.3d 563, 568 (5th Cir. 1994).

16

based upon a lack of informed consent or negligence in adequately obtaining informed consent and for negligent supervision by Dr. Connaughton during the surgical breast biopsy.

### V. Order of Judgment

It is ORDERED that Defendant is liable to Plaintiffs and shall pay the following amounts: Plaintiffs shall recover the total amount of $1,272,903.

It is further ORDERED that post-judgment interest shall accrue and be payable on all of the above amounts at the maximum rate allowable by federal law.

It is further ORDERED that the Court approves attorneys' fees payable by Plaintiffs to Whitehurst, Harkness, Brees & Cheng, P.C., in the amount of 25% of the total judgment, including interest.

It is further ORDERED that all findings of fact more appropriately considered conclusions of law are so deemed. All conclusions of law more appropriately considered a finding of fact are so deemed.

It is further ORDERED that Defendant shall pay Plaintiffs' taxable court costs.

Finally, it is ORDERED that all pending motions are DISMISSED AS MOOT.

Signed this 23rd day of February, 2010.

Royal Furgeson
Senior United States District Judge

17